Cuyahoga County Bd. of Revision, Appellee, *v.* Federal Reserve Bank of Cleveland, Appellant.

(Decided April 5, 1968.)

*Mr. Ralph D. Kovanda* and *Mr. John E. Forrester*, for appellant.

*Mr. John T. Corrigan*, prosecuting attorney, *Mr. Thomas P. Cyrus* and *Mr. Richard A. Goulder*, for appellee.

### Entry of The Board of Tax Appeals.

This cause and matter came on to be considered by the Board of Tax Appeals upon three notices of appeal filed herein under date of August 25, 1967, by the appellant above named from three separate decisions of the Cuyahoga County Board of Revision dated August 1, 1967, in which the taxable valuation of certain real property owned by the appellant was determined by the Board of Revision for the tax years 1964, 1965 and 1966. The

real property involved is situated in the Cleveland City Taxing District and the property is physically located at 1455 East Sixth Street (corner of East Sixth Street and Superior Avenue) Cleveland, Ohio, and is known as Permanent Parcel 101-5-8.

For the tax year 1964, the Board of Revision determined the taxable value of the property to be $4,891,-760.00. The appellant says that for that year the current fair market was $6,584,000.00, and that the correct taxable value should be $2,501,920.00.

For the tax year 1965, the Board of Revision determined that the taxable value was $4,891,760.00. The appellant says that the current fair market value of the property for that year was $6,816,000.00 and that the correct taxable value is $2,590,080.00.

For the tax year 1966, the Board of Revision determined that the taxable value of the property was $4,891,760.00. Appellant says that the current fair market value of the property for the year 1966 was $6,994,000.00, and that the correct taxable value was $2,657,720.00.

The matter was submitted to the Board of Tax Appeals upon the notices of appeal, the statutory transcript supplied by the Board of Revision and the testimony and evidence presented at a hearing before the Board of Tax Appeals in Cleveland, Ohio, on October 19, 1967.

As above noted this dispute over value relates to the Federal Reserve Bank Building at the corner of Sixth and Superior in Cleveland, for the tax years 1964, 1965 and 1966. The Auditor of Cuyahoga County assessed the subject property for the three tax years 1964, 1965 and 1966 at the following taxable values:

| Land | $ 528, 130. |
|---|---|
| Building | 4,363,630. |
| Total | $4,891,760. |

The Cuyahoga County Board of Revision, at a hearing on complaints filed with it by the owner (Section 5715.19, Re-

vised Code), on August 1, 1967, did not grant any reduction but approved the foregoing valuations of the County Auditor in the following decision:

"Subject parcel has a frontage of 198 feet on East 6th Street with a depth of 216 feet extending along Rockwell Avenue and Superior Avenue. The improvement consists of an eleven floor, plus ground floor bank building erected in 1924.

"At the oral hearing an Appraisal Report prepared by Robert L. Free was presented from which the following information is taken: Subject property is located in the northeast sector of the downtown Cleveland business district. This building was constructed in 1921-24 and is of fireproof masonry and steel frame construction with concrete floors. The exterior walls are pink marble and granite with monumental windows and bronze grilles at the first floor level, ornamental balusters at the third floor, and a six inch promenade setback at the tenth floor. The interior of the banking area is mainly decorative marble finish with bronze and wrought iron trim. Upper floors are finished with painted plaster walls, acoustic tile, fluorescent lighting, asphalt tile floors, and heavy wood double hung sash and trim.

"A central core runs up through the structure and contains corridor space, elevator, lobbies, washrooms, locker rooms, vaults, eleven passenger elevators plus a freight elevator. Marble and painted plaster is used in corridors and washrooms. Air conditioning was installed in the building in 1955. Heating was converted to commercial supply in 1955 and the electric power in the building is DC.

"In further describing the building, it was noted that the two basements in the building plus the ground floor and mezzanine contain the three main vaults and security courts. The first floor and mezzanine areas contain the main banking room which is two stories in height with highly ornamental finish. The second to ninth floors are used primarily for office space for accounting, examiner, printing and storage purposes. Executive offices includ-

ing lobby, dining room and directors room are located on the eighth floor and are finished with wood panels, wall fabric and marble fireplaces. On the ninth floor mezzanine are located the archives, medical, laundry, and assembly room facilities. An employees cafeteria, lounge room, kitchen and gymnasium are located on the tenth floor. The gymnasium is equipped with hardwood floor, stage area and a projection booth. All rooms are of modern finish. An attic occupies the top floor of the structure, being used as a rifle range and promenade area.

"In short, this building is variously described as being of monumental style, having colossal statuary and classic Greek ornamentation on the exterior, with thirty-six inch thick fortress-style walls, and large public areas.

"The Auditor's Building Card rates subject property as being heavy AAA construction throughout.

"It was noted that subject building will likely remain standing longer than any other in the downtown Cleveland district.

"In analyzing the property, Mr. Free stated that the ratio of gross square feet in the building as to net rentable useable square feet was about 57.8%, being obsolescent by modern standards. The land value was computed by comparing a number of downtown land sales along Superior Avenue, St. Clair Avenue and East 9th Street, leaving subject property with a land value of $27.50 per square foot in 1964, $30 per square foot in 1965, and of $32.50 per square foot in 1966, reflecting the increase in area land values due to the Erieview Renewal project. Thus, final land values on the basis of 43,016 square feet amount to $1,183,000 in 1964, $1,290,000 in 1965, and $1,398,000 in 1966.

"Using a Cost Approach to value, Mr. Free revised a former appraisal and listed the property as having an average value of $25.11 per square foot of space for a reproduction cost of $13,781,381. Other estimates noted by the Board of Revision ranged from $14.9 million to $17 million. Applying a 1½% annual depreciation and allowing for capital improvements such as fluorescent lighting,

air conditioning and protection systems, plus an additional depreciating factor of obsolescence due to low net rentable ratio, Mr. Free revised a former appraisal to show a net depreciated building value in 1964 of $5,401,000 or $6,584,000 total including land, based on reproduction cost of $13,303,185 and a 59.4% depreciation factor. The same method of estimation was utilized for the 1965 and 1966 tax years, using reproduction costs of $13,781,381 for 1965 and $14,498,033 in 1966. Increased depreciation factors were taken, and higher land values were used, resulting in total values of $6,816,000 for 1965 and $6,994,000 for 1966.

"In estimating value of subject property by the Income Approach, revised figures were submitted showing 1964-66 average figures of rental received, and using rentable areas of the building. Average gross income was estimated to be $1,227,902 based on rentals projected at an average charge of between $3.75 and $4.83 per square foot. Since the building is continuing owner-occupied, no vacancy factor was applied. Expenses were estimated to be $470,890, computed at 280,626 square feet of net rentable area at 167.8c, leaving net income of $757,012. Mr. Free imputed various income amounts to land value for each year in question, and capitalized the income attributable to the building, leaving final estimates by income approach of $6,435,000 for 1964, $6,423,000 for 1965 and $6,366,000 for 1966.

"Market Data Approach was partially revised, indicating this property to be rated with the Union Commerce Building and the Cleveland Terminal Tower Building as to market value per square foot of rentable area. On this basis it was estimated that the property had a market value of $6,596,000 in 1964 and, based on revised figures, a market value of $6,980,000 in 1966.

"A correlation of the results of all three methods was presented for the three years in question, and Mr. Free submitted final values estimates on the Cost Approach to value. These final correlated market values were: $6,584,-000 as of 1964, $6,816,000 as of 1965, and $6,994,000 as of 1966. Finally, it was again noted that subject property is not operated on the usual commercial investment basis,

but is a special-purpose building occupied by a quasi-public agency operated through the federal government.

"Also submitted at the hearing were specific amendments to the figures originally submitted to the Board of Revision in the complaints. Affidavits and correspondence relating to various improvements and alterations in 1965 plus a building permit covering the same were included in the Board of Revision file. A certificate of the Common Level of Assessment for 1967 was issued at the request of complainant by the Board of Tax Appeals and was submitted at the hearing.

"It was further noted that the original appraisal report prepared by Robert L. Free was dated June 13, 1966, and that a supplemental appraisal dated May 11, 1967, was furnished at the oral hearing May 12, 1967.

"Upon consideration of the evidence and testimony, the Board of Revision *found the taxable value of the subject property to be $4,891,760, involving no reductions for the tax years 1964, 1965 and 1966.*"

The case of *Western Industries, Inc.,* v. *Hamilton County Board of Revision,* 170 Ohio St. 340, gives the guide which this Board must follow in resolving this appeal. That case states in part:

"* * *

"In determining the value of property for the purpose of taxation, the assessing body must take into consideration all factors which affect the value of the property. *B. F. Keith Columbus Co.* v. *Board of Revision of Franklin County,* 148 Ohio St. 253; *American Steel and Wire Co.* v. *Board of Revision of Cuyahoga County,* 139 Ohio St. 388.

"The burden is on the taxpayer to prove his right to a deduction. He is not entitled to the deduction claimed merely because no evidence is adduced contra his claim. *Higbee Co.* v. *Evatt, Tax Commr.,* 140 Ohio St. 325."

In other words, as this Board said in the case of *Leone Majoewsky* v. *Clermont County Board of Revision,* decided by this Board under Case No. 65430, by its entry dated September 20, 1967 at page 305 of said entry in Vol. 132 of the Board of Tax Appeals Journal.

"As we view the law, it is this:

"In a case where the formula used by the County Auditor, as assessor of real property, is not unreasonable on its face and is in substantial compliance with the statutory rules for the valuation of real property by a uniform method and a taxpayer disagrees with the resulting value thus computed by the County Auditor (or the Board of Revision upon appeal), and appeals said valuation to the Board of Tax Appeals, said taxpayer cannot prevail before this Board merely by attacking the formula used by the assessor. If a taxpayer is to prevail in such a valuation case, he must bring on his own competent evidence to demonstrate to the Board of Tax Appeals just what is the 'true value' and correct 'assessed value' of the property involved. In other words, in a case of this kind, the burden lies upon the taxpayer to prove by competent evidence of probative value that the valuations he claims are the correct and proper valuations.''

What does the record disclose, with respect to the proper valuation of the subject property? Has the taxpayer carried the burden of proving his right to a reduction from the assessed value of the subject property of $4,891,760.00, as found by the Cuyahoga County Auditor and the Board of Revision?

At the hearing before the Board of Tax Appeals evidence was submitted of the fair market value of the subject property, by Mr. Free, a real estate expert offered by the appellant, who testified that the fair market value for the subject property was as follows: for 1964, $6,584,000; for 1965, $6,816,000; and for 1966, $6,994,000.

The Board of Revision, on the other hand, presented Mr. Cleminshaw, also a real estate expert, who stated his opinion of the fair market value of the subject property, for each of the years in question, as follows:

| | |
|---|---|
| Land | $ 1,290,300. |
| Building | 12,432,600. |
| Total | $13,722,900. |

(Appellee's Exhibit A, pp. 123-4)

The evidence shows the land is improved with a monumental type building constructed over a period of about three years, from 1921 to 1924, the structure being eleven stories high. There is a ground floor, basement and sub-basement, two mezzanines and an attic. The building serves as the main office of the Federal Reserve Bank of Cleveland. The area of the property is 43,016 square feet (198 feet 11 inches by 216 feet 3 inches).

Appellant offered as its expert on real estate values, Mr. Robert L. Free, who appraised the property and gave his opinion as the fair market value for each of the three years as follows:

|  | Land | Building | Total |
|---|---|---|---|
| January 1, 1964 | $1,183,000. | $5,401,000. | $6,584,000. |
| January 1, 1965 | 1,290,000. | 5,526,000. | 6,816,000. |
| January 1, 1966 | 1,398,000. | 5,596,000. | 6,994,000. |

Mr. Free stated that the up-trend in land values over the three-year interval, from $27.50 to $32.50 per square foot was "due primarily to the activity on East 9th Street, arising from the Erieview Project * * *." (R. p. 34.)

Mr. Free arrived at his final conclusion as to the fair market value of the land and building after analyzing the property through the traditional three approaches to value, viz., cost, income and market approaches (R. p. 35).

In analyzing Mr. Free's cost approach to value, it appears that he used the replacement cost, less depreciation at the rate of 1½% per year, offset by 11% reflecting the modernization performed in the building. (R. pp. 37-38.) He then added a 10% penalty for obsolescence caused by the loss for both banking and office purposes of the central core of the building. This also results in a low ratio of rentable space to gross area. (Free Supplemental Appraisal, pp. 10-12.) There are 439,077 gross square feet in the building. (R. p. 40.) Mr. Free computed the replacement cost to be $13,781,381, or $31.39 per square foot as of January 1, 1965. (R. p. 40.)

Mr. Free stated that he checked his replacement cost

estimate (he explained the difference between "replacement cost" and "reproduction cost" at p. 36 of the Record is, "Briefly the reproduction cost is the cost of replacing the building as exact a replica as can be done at this date. Replacement cost means the cost of replacing the structure in the manner in which you would build it as of this date") by obtaining an actual reproduction cost estimate by a general contractor experienced in the construction of multiple story office buildings. This independent estimate was submitted by the Turner Construction Company, presently engaged in the construction of the Erieview Tower and the Cuyahoga Savings buildings in Cleveland, Ohio. Mr. Arthur A. Northrup, the chief estimator for the Turner organization, was presented, and gave his testimony. He computed the reproduction cost—and this estimate came to $13,000,795. (Exhibit No. 1, p. 2.) Since this estimate did not include the items shown on p. 3 of Exhibit No. 1, such as, vault doors, lining, special equipment for food service, etc., he added six percent for architect's fees and arrived at a total adjusted reproduction cost of $14,617,106 or $33.29 per square foot. (R. pp. 49-50; Exhibit 5, p. 4.)

Listing these two independently estimated totals, we note the close parallel:

| Witness | Fair market Value | Cost Per Sq Ft. |
|---|---|---|
| Free (Replacement) | $13,781,381. | $31.39 |
| Northup (Reproduction) | 14,617,105. | 33.29 |

The difference between these two figures, 5.72%, is largely explained in that 4.12% of it is made up, according to Mr. Free, * * * by "using highest grade of Indiana limestone or a less expensive marble, rather than Georgia marble * * *." (R. p. 50; Exhibit 5, p. 5.)

Mr. Free further analyzed the original cost of the building, when trended from 1921 to the period 1964-1965. (R. pp. 74-75; Exhibit 5, p. 2.) He took the original cost figure of $8,000,000 and applied the Boeckh index factor of

3.32 and achieved a 1964 comparison of $24,000,000 or $54.66 per square foot. Mr. Free rejected this trended cost method because the $54 per square foot cost is * * * utterly out of keeping with my experience * * *,'' and that the subject building is * * * 62% not finished as well as * * * ordinary commercial office space'' * * * and ''* * * .38% * * * special purpose type and more costly than commercial office space. * * *'' Further, that * * * ''commercial office space is currently being built for $26 to $29 per square foot.''

The evidence also shows that Mr. Free estimated the value of the subject property by use of the income approach, under which he assigned a $9.00 per square foot per year rental, which he stated in his opinion, was * * * ''a fair proportion compared with the actual rentals being paid for banking rooms and particularly the recent leasing of the Cuyahoga Savings space on the first floor at $7.00 per square foot.'' Mr. Free averaged this $9.00 rate so that he placed $5.50 per square foot rental for the 8th floor for office space, and $3.75 per square foot for the less expensive type office space. Thus, when he arrived at the final average of $4.38 per square foot, and multiplied this by the net rentable area of 280,626 square feet, he found the income produced to be $1,227,902. He did not deduct the usual 7% vacancy allowance because it is an owner-occupied property. (R. p. 52; Exhibit N pp. 13-15.)

For expenses the witnes used $1.67 (in new buildings this is $1.49 * * * R. p. 53). This produced an expense total of $470,890 leaving net income before taxes of $757,012. (Exhibit N, p. 13.) Capitalizing this income at 6.5%, 4% recapture and 2% taxes, a total of 12.5% gave a market value of $5,252,000 for the building which when added to the land of $1,183,000 gave a total market value by the income approach for 1964 of $6,435,000; for 1965, $6,423,000; and for 1966, $6,366,000. (R. pp. 53-54.)

Mr. Free described how he applied the market approach to value. (R. pp. 54-60.) He used the Union Commerce Building which he considered most similar. It was constructed at the same period as the subject building

(1921-1924), for banking use, and stated that although the Federal Reserve was only 30% of the size of the other, they were comparable from the standpoint of value per square foot. (R. p. 56; Exhibits 6 and 7.) The actual sale price of the Union Commerce in 1961-1962 was $25,500,-000 but the witness stated that in his opinion, the sales price included a credit factor arising out of the fact that in the sale agreement, the bank took back a lease, thus placing its full credit behind the lease, so that in the witness' opinion, the subject property was worth only $20,400,000. Based on these two figures, Mr. Free stated the application of the 30% ratio to the lower market figure of $20,400,000 produced a value for the subject property of $6,120,000; or a ratio figure at the 30% rate, of $7,650,000, based upon the actual inflated sale price. (R. pp. 56, 57; Exhibit 7.) He concludes (R. p. 57; Exhibit 7, p. 3), following adjustments for current values, that this comparison with Union Commerce market, using the market approach, the subject building would have a value of $6,600,000, arising out of the adjustment by increasing the projected Union Commerce sale price to $22,000,000 assuming a 5% to 10% increase in market value from 1961-1962. In his opinion the actual sale price of $25,500,000 would not be obtainable today, because the prime interest rate has risen from 53/8% to 6½%. (Exhibit 7, p. 3.)

Following a comparison of his three different traditional approaches to market value, Mr. Free adopted his replacement cost values as follows: (R. p. 60; Exhibit p. 17.)

|  | Jan. 1, 1964 | Jan. 1, 1965 | Jan. 1, 1966 |
|---|---|---|---|
| Land | $1,183,000 | $1,290,000 | $1,398,000 |
| Building | 5,401,000 | 5,526,000 | 5,596,000 |
| Total | $6,584,000 | $6,816,000 | $6,994,000 |

The expert appraiser for the appellee, Mr. William Cleminshaw, testified that for all three years, the land value was $1,290,300. (R. p. 114.) To appraise the value of

the building, Mr. Cleminshaw used the original cost of $8,000,000 which he trended to the three-year period in question (R. p. 116), with the result that he obtained a sum of $25,912,000. He used his own organization (R. p. 115) index of 323.9, * * * "produced or published by the J. M. Cleminshaw Company on a national basis for all types of construction * * *." To this figure he added additions of $1,883,839 for a total of $27,795,899. (R. p. 116.) Mr. Cleminshaw did not use either the market data approach, nor the income approach in arriving at his final estimate of fair market value. (R. p. 126.) Mr. Cleminshaw stated he used replacement cost values, based upon * * * "his knowledge of costs, and by using component parts to arrive at a total value * * *." (R. p. 116.) This total value for the building was $26,040,480.00 (R. p. 118), which is $63 per square foot. Mr. Cleminshaw allowed 52% (called 48% by the witness (R. pp. 124; 149-152) for depreciation and obsolescence, whereas, Mr. Free allowed 59.9%. The witness' final building fair market value figure was $12,432,-000 which, when added to the land of $1,290,000, made a total of $13,722,900. (R. p. 123.)

Mr. Cleminshaw stated the replacement cost, as he computed it on a square footage basis for the Union Commerce Building would be * * * "about $28.12 * * *," while the replacement cost of the Federal Reserve Building, as he computed it, would be "* * * $63.00." (R. p. 135.) Mr. Cleminshaw stated the subject property could not be compared to the Union Commerce Building, but he acknowledged that Floors 3-7 are typical office floors; Floor 8 a typical executive floor; the 9th Floor a typical office floor; the 2nd Floor a typical service floor, and that "* * * from the 3rd Floor on up to the top of the building it (Federal Reserve) could be equated to another commercial building * * *." (R. p. 127, 128.)

Mr. Cleminshaw acknowledged that a quantity survey by an estimator would produce a more accurate figure than his. (R. p. 141.) This quantity survey appears to be precisely what the independent expert, Mr. Northrup, submitted to appellant. (R. Appellant's Exhibit 1.)

An examination of the figures used by Mr. Cleminshaw in arriving at his estimate of fair market value, shows that he used an unsupported factor—10%—for arriving at his plumbing total of $2,000,000 (R. p. 141); interior finish, again a percentage which the witness stated * * * "I didn't have the prices of the marble. I am just using a figure which I feel would fit the situation, based upon the knowledge that I have of that type of thing" (R. p. 142); again, ventilating and heating, $2,-000,000 a percentage (10%) of the total; the electrical figure of $2,300,000, again a percentage; security features, $2,000,000 again, a percentage (R. pp. 143-144). This appears to total about 40% of the replacement cost estimate submitted by Mr. Cleminshaw to have been mere applications of percentage factors, in the experience of the appraiser; and that a quantity survey would give more accurate figures than the use of the percentages. (R. p. 141.)

After a review of the entire record, the Board of Tax Appeals finds that the square foot replacement of $63, as testified to by Mr. Cleminshaw is not supported by the evidence. Rather, the replacement cost figures of appellant, as furnished by Mr. Free of $31.39, are amply supported by the actual reproduction cost of $33.29 as presented by the construction representative, Mr. Northrup. The difference between the latter two figures of 5.72% was explained in the use of Georgia marble in the subject property, and the use of a more economical material in the cost estimate.

Further justification for the rejection of the appellee's appraisal, and the adoption of the valuation data furnished by the appellant, is found in the fact that the former did not consider the merit of using the two additional traditional methods of testing value, viz., the market approach and the capitalized income approach. On the other hand, the expert for the appellant elected to test his replacement cost values by these two additional testing techniques, and found them clearly in support of his cost totals. (Exhibit H, p. 15.)

|  | Cost | Market | Income |
|---|---|---|---|
|  | $6,727,000 | $6,596,000 | $5,270,000 |

The Board of Tax Appeals, based upon the entire record of value as submitted to it hereby finds that the fair market value of the subject property is:

|  | Land | Building | Total |
|---|---|---|---|
| January 1, 1964 | $1,183,000 | $5,401,000 | $6,584,000 |
| January 1, 1965 | 1,290,000 | 5,526,000 | 6,816,000 |
| January 1, 1966 | 1,398,000 | 5,596,000 | 6,994,000 |

Further, the Board of Tax Appeals finds that after applying the common assessment factor of 39% for 1964, 1965 and 1966 to the foregoing fair market values, that the correct taxable values for the subject property are as follows:

|  | Land | Building | Total |
|---|---|---|---|
| 1964 | $461,370 | $2,106,390 | $2,567,760 |
| 1965 | 503,100 | 2,155,140 | 2,658,240 |
| 1966 | 545,220 | 2,182,440 | 2,727,660 |

Accordingly the Cuyahoga County Auditor is instructed to correct his records so as to carry into effect the foregoing.

I hereby certify the foregoing to be a true and correct copy of the action of the Board of Tax Appeals of the Department of Taxation this day taken with respect to the above matter.

ARTHUR W. MOORE,
*Secretary.*